

FILED

NOV 1 2 2013

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TECHNOLOGISTS INCORPORATED,

        Plaintiff,

    v.

THE UNITED STATES, acting through the
UNITED STATES ARMY CORPS OF
ENGINEERS, TRANSATLANTIC DISTRICT-
NORTH;

LIEUTENANT GENERAL THOMAS P.
BOSTICK, in his official capacity as Chief of
Engineers, U.S. Army Corps of Engineers;

COLONEL MICHAEL J. PRICE, in his official
capacity as District Engineer, U.S. Army
Corps of Engineers, TransAtlantic Afghanistan
District;

SUZANNE M. WEAR, in her official capacity
as the Chief, Contracting Division, U.S. Army
Corps of Engineers, TransAtlantic Afghanistan
District (formerly TransAtlantic District –
North),

        Defendants.

CIVIL ACTION FILE NO. 6 C

13-896 C

## COMPLAINT

### I. INTRODUCTION

1. This action seeks (a) a declaration that a certain decision of the United States Army

    Corps of Engineers (USACE) to terminate for default Plaintiff's rights entirely under

    contract number W912DQ-12-C-4000, Afghan National Police Ministry of Interior

    Headquarters Phase II, awarded to Plaintiff on December 16, 2011, was improper,

    arbitrary, capricious, without factual support and/or contrary to law; (b) conversion

    of that termination for default instead to a termination for convenience; and (c) just

compensation from the United States for the costs of (1) construction services performed under the terms of that contract up to and including the date of termination; (2) retainage improperly accounted for on the project by the Government; (3) the supplies and materials Ti ordered or manufactured but had not placed at the project site due to the improper termination; (4) the additional security costs incurred by the Plaintiff at the direction of the Government following the Suspension of Work Notice, (5) the demobilization costs incurred in vacating the project site and (6) other damages as the court deems appropriate.

## II. JURISDICTION

2. This Court has jurisdiction as a direct access action pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601-13, Sec. 609(a) (1982).

## III. PARTIES

3. Plaintiff, Technologists Incorporated ("Ti"), is a corporation organized under the laws of the State of Virginia.

4. The Defendant is the United States, acting by and through the United States Army Corps of Engineers ("USACE"), specifically then known as TransAtlantic District North ("TAN"), and its Chief of Contracting, Ms. Susan M. Wear, who is named in her official capacity as the Contracting Officer who authored the "Notice of Termination for Default of Contract No.W912DQ-12-C-4000, Afghan National Police Ministry of Interior Headquarters Phase II."

## IV. **THE CONTRACT**

5. In October, 2011, USACE issued Solicitation No. W912DQ-12-R-4001-0001 for the construction of a new Ministry of Interior Headquarters complex for the Afghan National Police (ANP), Ministry of Interior (MOI) in Kabul Province, Afghanistan, located adjacent to the Kabul International Airport (KAIA)

6. The construction scope included a new Ministry of the Interior headquarters building, a communications building, water supply, waste water treatment plant, power plant, fuel storage, utility distribution and other supporting infrastructure.

7. The work was to meet and be constructed in strict accordance with the construction drawings and technical specifications provided by USACE.

8. The Solicitation informed offerors that the estimated cost range for the project was estimated between $25,000,000.00 and $100,000,000.00.

9. The construction was essentially Phase II of IV phases of an ANP compound, the first Phase of which was awarded to a different contractor than Ti.

10. Based upon the provisions in the Solicitation, Ti prepared and submitted a proposal to the Government.

11. On December 16, 2011, TAN awarded Ti Contract No. W912DQ-12-C-4000 ("the Contract"), in the amount of $30,633,335.96. (Included at **Exhibit A**).

12. At the time of award, the Period of Performance ("PoP") for completion of the scope of work was four hundred sixty (460) days from the date of Notice to Proceed ("NTP").

13. TAN issued NTP to Ti on January 17, 2012. (Attached at **Exhibit B**).

14. Thus, on the date of issuance of NTP, not counting that date, the Contract Completion Date ("CCD") was April 21, 2013.

15. TAN issued five (5) Modifications to that base contract. (Included at **Exhibit C**).

16. An administrative Modification dated May 12, 2012, in the amount of $55,710.23 for topographic survey data that added no time to the contract but was also not tied to the PoP or the CCD.

17. The Modification related to KN001 is dated May 31, 2012 – for Ti to survey the site.   The amount of the modification was $55,710.22, with no additional time added to the PoP.

18. Modification KN002 dated July 24, 2012 – for Ti to relocate the pump equipment by adding height to the concrete pad - increased the contract value by $9,012.48 with no additional time added to the PoP.

19. Modification A0003 dated July 30, 2012 – for weather days encountered to that date - did not increase the contract value, but added 31 days to the PoP and the CCD became May 22, 2012.

20. Modification A0004 dated August 27, 2012 – to add a well and modify the original well house to accommodate the second well - increased the contract value by $172,692.97 but added no additional time to the PoP.

21. The contract file also reflects a total of forty (40) Serial Letters ("SL") between Ti and TAN.  Ti authored twenty-six (26) of those letters and TAN authored fourteen (14).  (Attached, from earliest to most recent, at **Exhibit D**).

22. The Parties also communicated via regular construction progress meetings. The nature of those meetings and topics discussed were captured in meeting minutes, totaling thirty-one (31) separate documents. (At **Exhibit E**).

23. Ti and TAN also had regular email and telephonic discussions. Emails Ti believes to be relevant to the Termination for Default are included herein. (**Exhibit F**).

24. Ti also registered daily logs on the project and uploaded them into the system as required by the Government. (Copies thereof are at **Exhibit G**).

25. On December 24, 2012, the Government sent Ti SL C-0014 to Terminate for Default (T4D) Ti's rights to proceed on the MOI project.

## V. WRONGFUL TERMINATION FOR DEFAULT CLAIM

26. The contract at issue contains FAR 52.249-10, Default (Fixed-Price Construction) (Apr 1984).

27. FAR 52.249-10(a), Default (Fixed-Price Construction) (Apr 1984), permits the Government to terminate for default ("T4D") a Contractor's right to proceed.

28. The authority to T4D is not without limitation.

29. Per subsection (b) of FAR 52.249-10, "The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages…if – delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor" [FAR 52.249-10(b)].

 FAR 52.249-10(b)(1) specifically precludes a Default determination if the Contractor is delayed due to "…(ii) Acts of the Government in either its sovereign or contractual capacity, (iii) Acts of another Contractor in the performance of a

contract with the Government,…or (xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers" [FAR 52.249-10(b)(1)].

## COUNT 1 – IMPROPER APPLICATION OF FAR 52.249-10(a)

30. Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

31. Ti did not "refuse[] or fail[] to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract" under the circumstances as described in the attached documentation [FAR 52.249-10(a)].

32. At no time did Ti refuse to prosecute any work or any separable part of the contract.

33. At no time did Ti fail to prosecute the work or any separable part of the contract.

34. The record reflects Ti diligently prosecuted the work and any separable part thereof in accordance with the contract terms and applicable FAR provisions.

35. The record also reflects that Ti regularly and factually communicated with the Government about the project status and the realities of construction in Afghanistan.

36. In the Government's administration of the contract, it failed to recognize or consider any of the factors contained herein which limit the Government's authority to terminate a contractor for default.

37. Errors under 52.249-10(a) included the Government's improper application of a straight line analysis in determining the anticipated contract completion date.

38. The Government performed a purely straight line analysis of Ti's project progress at the time of issuance of the Show Cause Notice. (SL C-0010).

39. This method calculates the number of days since NTP, against the percentage complete as determined by the latest Engineer ("ENG") Form 93, to give the percentage per day of work completed by the contractor, and then adds the requisite number of days to the date on which the calculation was made to determine an "Anticipated Contract Completion Date."

40. Ti informed the Government of this errant analysis in its response to SL C-0009 (SL H-0019).

41. The Government should have applied a proper realistic earnings curve to calculate "Anticipated Completion Date."

42. Such earnings curve accounts for the cost loaded schedule being back loaded and the inherent spikes associated with the large ticket long lead items being delivered and installed in a relatively short period of time when considered for their respective activities on the pay request cycle.

43. Another error occurred when the Government improperly failed to apply proper credit for concurrent construction activities resulting in an improper analysis of the anticipated CCD used as a basis for the termination decision.

44. Ti conducted parallel and concurrent work under the contract which is not accounted for in a straight line analysis such as that performed by TAN.

45. As one example, Ti produced 80% of the required CMU block (or more than 90,000 pieces) to complete this project.

46. This activity is not included in the pay request as Ti was not entitled to invoice for stored materials or supplies.

47. Since the activity is not included in a pay request it is not accurately represented in the overall percentage complete for the project.

48. Ti could also not bill the Government for its concurrent work.

49. Ti is entitled now to be reimbursed for that work and the costs of other supplies and materials associated with the MOI project that it could not previously bill the Government.

50. Another error includes the Government's regular and improper request for updated schedules inducing confusion in project scheduling and management and an unreliable and unpredictable progress payment process.

51. With each pay request Ti provided updated schedules consistent with the requirements referenced by TAN in SL C-0014, pages 2 and 3. (See Schedules at **Exhibit K**).

52. The contract required at Section 01321 that unless the COR requests an interim update to the schedule, the current monthly updated schedule accepted by the Government shall be used to display the impacts of the change.

53. Copies of all schedules are attached at **Exhibit H** and included with the Invoices at **Exhibit K**.

54. The last construction schedule provided to the Government is attached at **Exhibit I**.

55. TAN regularly approved cost-loaded schedules submitted by Ti and once Ti submitted its pay requests under the approved cost-loaded schedule TAN continually required modification.

56. This constant modification was without a factual basis.

57. This constant modification was predicated on arbitrary reductions by the Government to Ti's submission of documentation for progress payments. (See **Exhibit K**).

58. The reductions came despite approval of Ti's construction progress by the Government's project representative, Local National Quality Assurance (LNQA) personnel.

59. The reductions came from TAN personnel who had not even walked the project site prior to mandating the reductions.

60. TAN also requested "Recovery Schedules" from Ti, separate from the modifications referenced in paragraph 55, above.

61. Ti provided realistic and verifiable "Recovery Schedules" which the Government regularly rejected since they did not show completion by the CCD as it existed on paper at the time.

62. The Government in its analysis of the Recovery Schedules did not take into account any of the delays which entitled Ti to a Time Extension and modification of the CCD.

63. On November 26, 2012, via SL H-0021, Ti replied to SL C-0011.

64. SL H-0021 informed TAN that Ti was submitting a Request for Time Extension.

65. On December 2, 2012, Ti submitted H-0024, "Request for Time Extension."

Ti00009

66. The Government never formally replied to H-0024 or any of Ti's grounds for the time extension requested.

67. Ti's last recovery schedule (at **Exhibit I**) is consistent with Ti's Request for Time Extension (H-0024) submitted to TAN.

## COUNT 2 – IMPROPER APPLICATION OF FAR 52.249-10(b)(1)(ii)

68. Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

69. Ti was and is entitled to a time extension for all the reasons identified in H-0024 and herein.

70. The delay, if any, in completing the contract for which the Government terminated Ti arose from "(ii) Acts of the Government in either its sovereign or contractual capacity" [FAR 52.249-10(b)(1)(ii)].

71. In SL H-0019 and H-0024, respectively, Ti again noted that on or about September 2, 2012 TAN requested that Ti allow another Contractor (namely "LakeShore") to use Ti's Entry Control Point ("ECP") for the MOI project for "a couple of weeks."

72. This additional burden was imposed without the Government adding any days to the contract completion date.

73. On information and belief, TAN based that request on a disagreement with the adjacent neighborhood near the ECP for Lakeshore's project ("MOI Phase III") that was forcibly closed due to the dispute.

74. In good faith, Ti agreed to cooperate with TAN and LakeShore, expecting that per TAN's request the joint use would last only a few weeks and that search procedures would remain under Ti's control.

75. The closed ECP near Lakeshore's project remained inaccessible for over 2 plus months (79 days).

76. The closed ECP reopened for LakeShore's use on or about November 20, 2012.

77. Access via the joint ECP did not remain under Ti's control as TAN promised.

78. LakeShore instigated search procedures over and above that performed by Ti.

79. The joint use resulted in a tremendous amount of additional traffic (deliveries, equipment and personnel) thru an ECP originally intended for use by only one contractor on only one project.

80. That ECP was not designed or constructed to accommodate the additional traffic or the staffing by multiple contractors and multiple security organizations.

81. This request resulted in a Change, or at least a constructive change, to the contract for which TAN never gave Ti additional time or compensation per the contract or FAR 52.243-1, Changes - Fixed-Price (Aug 1987).

82. The contract, which included FAR 52.243-1, requires that for this change, or at least constructive change, that the Contracting Officer make "an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract" [FAR 52.243-1(b)].

83. The Contracting Officer could have acted on Ti's proposed Time Extension because TAN had not made final payment on the contract.

84. The Contracting Officer took no action, citing only to the Time Extension and Scheduling provisions of the contract but not the Changes Clause.

85. Per FAR 52.249-10(b)(1)(ii), another delay, if any, in completing the project arose from TAN being unresponsive to Ti's Requests for Information (RFIs).

86. Ti submitted several RFIs related to the performance of another Government contractor (believed to be "ACF"), via RFI-0028 and RFI-0029. (At **Exhibit J**)

87. TAN finally replied to RFI-0028 and -0029.

88. In SL H-0023 Ti informed TAN that the replies uploaded did not respond to the matter or questions at issue. (**See H-0023 at Exhibit D**).

89. TAN never replied to SL H-0023.

## COUNT 3 – IMPROPER APPLICATION OF FAR 52.249-10(b)(1)(iii)

90. Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

91. As the delay, if any, in the anticipated contract completion arose in part from "(iii) Acts of another Contractor in the performance of a contract with the Government," TAN should not have Terminated Ti for Default.

92. The Government's Contractor on MOI Phase III, Lakeshore, insisted upon security changes at the ECP that created further delay beyond just an increase in the volume of construction traffic.

93. Each vehicle entry at the ECP took at least three to four times as long and sometimes more, for a period in excess of two months.

94. The contract also required Ti to complete asphalt work following completion of preparatory work by another Government contractor, who on information and belief was named "ACF."

95. On information and belief, this other Government contractor failed to deliver what was required of it by the contractually required date.

96. This other Government contractor also failed to deliver what was required of it by the date on which Ti was scheduled to begin its work based upon the baseline schedule as initially approved by the Government.

97. The work by the other Government contractor also failed to comply with the requirements contractually imposed on Ti such that Ti could not properly complete the work assigned to it in the contract at issue herein.

98. Even with the revised schedules Ti provided to the Government at the Government's request and/or direction, Ti could not begin the work required due to the failures of the other Government contractor.

99. Ti regularly informed the Government of these delays at the project site, during project coordination meetings and via email.

100. The failure of the other Government contractor to deliver as required contributed to the delays, if any, in Ti's ability to make the progress on the instant project as desired by TAN.


**COUNT 4 – IMPROPER APPLICATION OF FAR 52.249-10(b)(1)(x)**

101.     Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

102.     As the delay, if any, in the anticipated contract completion arose in part from "(x) unusually severe weather," TAN should not have Terminated Ti for Default.

103.     Ti documented the unusually severe weather and its impacts on the construction activities in the daily logs uploaded to the Government's system.

104.     The Government is informed of and put on written notice of those delays on a daily basis as the written daily logs are uploaded into the Government system into which Contractors are required to load their daily logs.

105.     Ti further informed the Government in SL H-0021 of an impending Request for Time Extension that would include these weather delays.

106.     Ti requested the appropriate extension of the PoP via SL H-0024.

107.     TAN never directly replied to H-0024.

108.     Ti justified and was entitled to an extension of the PoP for a period of no less than 108 days as described in H-0024.

## COUNT 5 – IMPROPER APPLICATION OF FAR 52.249-10(b)(1)(xi)

109.     Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

110.     As the delay, if any, in the anticipated contract completion arose in part from "(xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of

both the Contractor and the subcontractors or suppliers," TAN should not have Terminated Ti for Default.

111.    Ti financed above and beyond what was anticipated for the instant project due to the failure of TAN to properly pay Ti on the MOI project.

112.    Ti financed above and beyond what was anticipated for the instant project due to failure of TAN to also properly pay Ti on other projects.

113.    Ti financed above and beyond what was anticipated for the instant project due to the Government's failure to timely process REAs or Claims on other projects.

114.    The REAs or Claims, not processed in accordance with the timeline allotted under the Disputes Clause of the FAR, and thus not paid within 120 days, becomes a "bad debt" on Ti's books with financial institutions.

115.    Without this collection of proper payments, Ti could not obtain additional financing from its lender.

116.    Without this collection of proper payments and additional credit from its lender, Ti could not order all the long lead items from subcontractors or suppliers.

117.    FAR 52.249-10(b)(2) goes on to state that the Contractor should notify the Contracting Officer in writing of any delay within 10 days from the beginning of such delay.

118.    This is consistent with the Contract provision cited by TAN in C-0014.

119.    Yet, in C-0014, TAN alleges that Ti failed to provide notice of any of the delays for which Ti requested an extension of time.

120.     This statement is inaccurate for numerous reasons, all referenced in this claim and incorporated here as if fully set forth again.

## COUNT 6 – COMMERCIAL IMPRACTICABILITY

121.     Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

122.     The Government failed to properly process Ti's project payments on the MOI contract.

123.     The Government failed to properly pay Ti on the MOI contract.

124.     The improper processing of project payments created financial impacts that made completion of the contract by Ti Commercially Impracticable, further excusing Ti's delay, if any, in performance of the MOI contract.

125.     The Government's failure to properly pay Ti on the MOI contract created financial impacts that made completion of the contract by Ti Commercially Impracticable, further excusing Ti's delay, if any, in performance of the MOI contract.

126.     The contract includes FAR 52.232-5, Payments Under Fixed-Price Contracts (September 2002).

127.     The contract also includes FAR 52.232-27, Prompt Payment for Construction Contracts (October 2008).

128.     Failure to order long lead items is a stated basis in SL C-0014 for the T4D.

129.     TAN did not properly pay Ti across the length of the contract.

130.    Failure of the Government to comply with the payment terms/requirements created financial issues which prevented Ti from ordering necessary long-lead items to keep the construction progress on schedule.

131.    Ti submitted Contractor Pay Requests under this contract included at **Exhibit K**.

132.    On those Pay Requests, the Local National Quality Assurance ("LNQA") representative serves as TAN's representative with regard to determinations of construction progress completion percentages.

133.    All ENG Form 93s related to this contract are contained with the respective pay documents at **Exhibit K**.

134.    All Prompt Payment Certificates and Supporting Data for Contractor Payment Invoice ("Prompt Payment Certificates") for this contract are also included with the corresponding pay documents at **Exhibit K**.

135.    Based on the TAN approved Contractor Pay Request for the period March 22, 2012 thru April 24, 2012, (No. 3) with the LNQA's approved percentages complete, Ti earned $3,259,940.28 of the contract value.

136.    On the same Contractor Pay Request, the Resident Office arbitrarily reduced the amounts approved by the LNQA without explanation, making the earned amount under the contract $3,078,740.13, a reduction of $181,200.15.

137.    The Prompt Payment Certificate for Estimate No. 3, dated April 21, 2012, then matches the $3,078,740.13 figure.

138.    TAN had previously approved Ti's cost loaded schedule.

139.     The LNQA representative on whom TAN relies walked the physical project with Ti and approved certain percentages complete.

140.     With the then arbitrary reductions made by the field office with no explanation, Ti was forced to make fiscal and schedule adjustments.

141.     However, following submission of the Prompt Payment Certificate which matched the Contractor Pay Request, TAN then again made reductions without explanation.

142.     TAN did not conduct a new physical walk through of the project.

143.     Without justification, and less than eight (8) days after submission of the proper Prompt Payment Certificate, TAN required Ti to adjust its previously approved by TAN cost-loaded schedule.

144.     Based on the required changes to Ti's cost-loaded schedule, TAN required Ti to modify the Prompt Payment Certificate for Estimate No. 3 (at **Exhibit K**, dated April 24, 2012).

145.     All of these required changes caused a reduction in the previously approved earnings to a value of $2,006,882.66, which was a total reduction of $1,071,857.47.

146.     No explanation for that reduction or requirement is given in any of the pay documents nor is it annotated in the Remarks section of ENG Form 93.

147.     TAN improperly paid Ti for the period March 22, 2012 thru April 24, 2012.

148.     Also, the Prompt Payment Certificate for Estimate No. 4 certifies payment approved in the amount of $2,840,604.44.

149.     Yet, the ENG Form 93, Block 14E, "Earnings this Period," only reflects earnings in the amount of $2,733,676.12, an unexplained reduction of $106,928.32.

150.     On the ENG Form 93 for Estimate No. 4, TAN states in the "Remarks" on page one (1) of the form, "Retainage of 10 percent…until satisfactory progress is achieved."

151.     That amount is required to be reflected in Block 14F of the ENG 93 so that if satisfactory progress is made it can be returned.

152.     A calculation of 10% of the earnings as noted on the Prompt Payment Certificate for Estimate No. 4 should be $284,060.44.

153.     However, the calculation of "Less Retained Percentage" at Block 14F does not match that number and instead notes a retained amount of $177,132.12.

154.     TAN reduced the Prompt Payment Certificate earnings of $284,060.44 by $106,928.32.

155.     This improper reduction results in the inability of Ti to earn that $106,928.32 value back by achieving satisfactory progress.

156.     That improper reduction also results in the $106,928.32 of earnings being lost in the overall administration of the project, as is reflected in future pay documentation detailed herein.

157.     TAN thus improperly withheld payment from Ti for pay period April 25, 2012 thru May 20, 2012.

158.    Based on the TAN approved Contractor Pay Request for the period May 21, 2012 thru June 21, 2012, (No. 5) with the LNQA's approved percentages complete, Ti earned $1,561,144.48 of the contract value.

159.    TAN's representative, the LNQA on whom TAN relies, walked the physical project with Ti and approved those percentages complete resulting in the value noted in the preceding paragraph.

160.    With that approval by TAN of those percentages, on June 20, 2012, Ti submitted a Prompt Payment Certificate for Estimate No. 5, matching the TAN approved earnings of $1,561,144.48.

161.    TAN had previously approved Ti's revised cost loaded schedule as required by TAN to be changed with Pay Estimate No. 3.

162.    However, following submission of the Prompt Payment Certificate which matched the Contractor Pay Request for Estimate No. 5, TAN then again made reductions without explanation.

163.    TAN did not conduct a new physical walk through of the project.

164.    Without justification, and less than one (1) day after submission of the proper Prompt Payment Certificate, TAN required Ti to again adjust its previously-approved-by-TAN cost-loaded schedule.

165.    Based on the required changes to Ti's cost-loaded schedule, TAN required Ti to modify the Prompt Payment Certificate for Estimate No. 5 (at **Exhibit K**, June 21, 2012).

166.    These latest required, unexplained and unjustified changes caused a reduction in the previously approved earnings to a value of $973,574.48, a reduction of $587,570.00.

167.    No explanation for that reduction or requirement is given in any of the pay documents nor is it annotated in the Remarks.

168.    ENG Form 93 for Estimate No. 5 reflects no newly retained amount.

169.    ENG Form 93 for Estimate No. 5 shows a "Previous Retained Percentage" of $177,132.12.

170.    ENG Form 93 for Estimate No. 5 makes no remarks with regard to whether or not Ti recovered the alleged "lack of satisfactory progress" from ENG Form 93 for Estimate No. 4.

171.    This still does not properly reflect the improperly withheld $106,928.32 value from ENG Form 93 for Estimate No. 4.

172.    TAN improperly paid Ti for the period May 21, 2012 thru June 21, 2012.

173.    On the ENG Form 93 for Estimate No. 6, TAN withheld 10% from Ti's payment for allegedly "deficient work and update of redline drawings."

174.    ENG Form 93 for Estimate No. 6 reflects earnings of $1,372,109.02.

175.    ENG Form 93 for Estimate No. 6 retained amount of $137,210.90 added to a "Previous Retained Percentage" of $177,132.12 equates to a retained amount of $314,343.02.

176.    This still does not properly reflect the improperly withheld $106,928.32 value from ENG Form 93 for Estimate No. 4.

177.    TAN improperly paid Ti for the period June 22, 2012 thru July 18, 2012.

178.    TAN then returned retainage of $137,210.90 from ENG Form 93 for Estimate No. 6 on the ENG Form 93 for Estimate No. 7 noting in the remarks that the alleged deficient work was "corrected" and that Ti had "adhered to" the correctional letters that had been sent.

179.    ENG Form 93 for Estimate No. 7 still does not properly reflect the improperly withheld $106,928.32 value from ENG Form 93 for Estimate No. 4.

180.    TAN improperly paid Ti for the period July 19, 2012 thru August 16, 2012.

181.    On EN Form 93 for Estimate No. 8, TAN annotated at Block 14E "Earnings This Period" of $302,888.19.

182.    Instead, per the Pencil Copy of Contractor Pay Request No. 8, the amount earned by Ti for the period was actually $380,422.84.

183.    Yet, TAN directed Ti to prepare the Prompt Payment Certificate for Estimate No. 8 in the amount of $350,069.43, a reduction of $30,353.41 (see **Exhibit K**, dated September 3, 2012).

184.    The basis for that reduction was not explained or justified.

185.    On September 5, 2012, TAN again made changes to the amount previously approved by their LNQA and the changed amount documented on the September 3, 2012 Prompt Payment certificate and directed Ti to complete a new Prompt Payment Certificate in the amount of $336,542.43.

186.    This was a reduction of $43,880.41 from the originally approved amount certified as a percentage of construction complete by the LNQA.

187.    This was an additional $13,527.00 reduction over the Prompt Payment Certificate of September 3, 2012.

188.     Again TAN required Ti to modify its cost loaded schedule that by this point had been approved, changed and reapproved by TAN on at least three (3) separate occasions.

189.     On the same ENG Form 93 for Estimate No. 8, TAN annotated in the "Remarks" on page one "10% retainage, $33[,]654.24."

190.     The "Earnings This Period" at Block 14F of EN Form 93 for Estimate No. 8 is $302,888.19.

191.     TAN took the other $33,654.24 directly off the revised Prompt Payment Certificate earnings of $336,542.43 instead of reflecting it as "Less Retained Percentage" in Block 14F.

192.     This improper payment results in the inability of Ti to earn that $33,654.24 value back by achieving satisfactory progress.

193.     That improper payment also results in the $33,654.24 in earnings being lost in the overall administration of the project, as is reflected in future pay documentation detailed herein.

194.     ENG Form 93 for Estimate No. 8 also fails to properly reflect the improperly withheld $106,928.32 value from ENG Form 93 for Estimate No. 4.

195.     When combined with the improperly withheld $33,654.24 from No. 8, a resultant $140,582.56 is improperly accounted for on the payment documents.

196.     By not properly deducting the retained percentage or amount at Block 14F of EN Form 93, Ti has no means or record by which to recover the combined amounts withheld by the Government.

197.     TAN thus improperly withheld payment from Ti for pay period August 17, 2012 thru September 5, 2012.

198.     The Prompt Payment Certificate for Estimate No. 9 shows earnings by Ti of $660,863.75.

199.     On the ENG Form 93 for Estimate No. 9, TAN withheld 10% retainage of $66,086.38 from Ti's payment for allegedly being "behind schedule and not resubmitting AUP."

200.     ENG Form 93 for Estimate No. 9 only reflects earnings of $594,777.37.

201.     ENG Form 93 for Estimate No. 9 only indicates a "Previous Retained Percentage" of $177,132.12.

202.     This still does not properly reflect the improperly withheld $106,928.32 value from ENG Form 93 for Estimate No. 4.

203.     This also does not properly reflect the improperly withheld amount from ENG Form 93 for Estimate No. 8 of $33,654.24

204.     It also does not properly reflect at Block 14F of ENG Form 93 for Estimate No. 9 the $66,086.38 retained.

205.     When combined with the improperly withheld $140,582.56 annotated herein, a resultant $206,668.94 is improperly accounted for on the payment documents.

206.     By not properly deducting the retained percentage or amount at Block 14F of ENG Form 93, Ti has no means or record by which to recover the combined amounts withheld by the Government.

207.    TAN thus improperly withheld payment from Ti for pay period September 6, 2012 thru September 18, 2012.

208.    The Prompt Payment Certificate for Estimate No. 10 shows earnings by Ti of $585,948.35.

209.    ENG Form 93 for Estimate No. 10 only reflects earnings of $556,650.93.

210.    With the calculations for all prior ENG Form 93 retainage, Ti computes that at the time of release of ENG Form 93 for Estimate No. 10 that the total amount actually retained by TAN across the improper payments to Ti was $383,801.06 and all were noted as withheld for being behind schedule and "not submitting AUP."

211.    On the ENG Form 93 for Estimate No. 10, TAN purports to return $200,000.00 of previous retainage for "improvements in quality and safety," when none of the retained funds to that point pertain to either of those matters.

212.    By returning $200,000.00, the remaining retainage should equal $183,801.06.

213.    In the remarks of ENG From 93 for Estimate No. 10, TAN then notes that it is still retaining "$21,197.95 for Area Usage Plan, and $162,603.11 for schedule slippage" which matches the $183,801.06 figure of the preceding paragraph.

214.    The remarks also then note "Additional 5 retainage withheld…for schedule concerns; $29,297.42."

215.    ENG Form 93 for Estimate No. 10 still only indicates a "Previous Retained Percentage" of $177,132.12, not $383,801.06.

216.    When adding in the returned $200,000.00, the form then shows an "overpayment" of retained percentage in block 15 of $-22,867.88.

217.     Despite then all the remarks noted, ENG Form 93 for Estimate No. 10 then again directly deducts the $29,297.42 from Ti's earnings as calculated on the Prompt Payment certificate.

218.     ENG Form 93 for Estimate No. 10 does not properly reflect at Block 14F the $29,297.42 retained.

219.     When combined with the still improperly withheld $183,801.06 annotated herein and on the ENG Form 93 for Estimate 10, a resultant $213,098.48 is improperly accounted for on the payment documents.

220.     By not properly deducting the retained percentage or amount at Block 14F of ENG Form 93 and not accounting for the previously retained amount, Ti has no means or record by which to recover the combined $213,098.48 withheld by the Government.

221.     TAN thus improperly withheld payment from Ti for pay period September 19, 2012 thru October 6, 2012.

222.     The "overpayment" of retained percentage in block 15 of ENG Form 93 for Estimate No. 10 is then carried over as "Previous Retained Percentage" at Block 14B of ENG Form 93 for Estimate No. 11 as $-22,867.88.

223.     Based on the TAN approved Contractor Pay Request No. 11 with the LNQA's approved percentages complete, Ti earned $675,332.47 of the contract value.

224.     TAN's representative, the LNQA on whom TAN relies, walked the physical project with Ti and approved those percentages complete resulting in the value noted in the preceding paragraph.

225.     With that approval by TAN of those percentages, on October 16, 2012, Ti submitted a Prompt Payment Certificate for Estimate No. 11, matching the TAN approved earnings of $675,332.47.

226.     TAN had previously approved Ti's cost loaded schedule revised at least four times as required by TAN.

227.     However, following submission of the Prompt Payment Certificate which matched the Contractor Pay Request No. 11, TAN then again made reductions without explanation.

228.     TAN did not conduct a new physical walk through of the project.

229.     Without justification, and less than four (4) days after submission of the proper Prompt Payment Certificate, TAN required Ti to again adjust its previously approved by TAN cost-loaded schedule.

230.     Based on the required changes to Ti's cost-loaded schedule, TAN required Ti to modify the Prompt Payment Certificate for Estimate No. 11 (at **Exhibit K**, October 20, 2012).

231.     These latest required, unexplained and unjustified changes caused a reduction in the previously approved earnings to a value of $666,902.29, a reduction of $8,430.18.

232.     No explanation for that reduction or requirement is given in any of the pay documents nor is it annotated in the Remarks.

233.     ENG Form 93 for Estimate No. 11 reflects "5% retainage, $33[,]345.11, for being behind schedule per aggressive management."

234.    ENG Form 93 for Estimate 11 does not reflect this newly retained amount at Block 14F.

235.    ENG Form 93 for Estimate No. 11 shows a "Previous Retained Percentage" of $-22,867.88 as opposed to what should be the correct amount of $213,098.48.

236.    By not properly deducting the retained percentage or amount at Block 14F of ENG Form 93 and not accounting for the previously retained amount, Ti has no means or record by which to recover the combined $33,345.11 and $213,098.48, for a total of $246,443.59 withheld by the Government.

237.    TAN improperly paid Ti for the period October 7, 2012 thru October 20, 2012.

238.    Based on the TAN approved Contractor Pay Request No. 12 with the LNQA's approved percentages complete, Ti earned $318,681.18 of the contract value.

239.    TAN's representative, the LNQA on whom TAN relies, walked the physical project with Ti and approved those percentages complete resulting in the value noted in the preceding paragraph.

240.    With that approval by TAN of those percentages, on November 7, 2012, Ti submitted a Prompt Payment Certificate for Estimate No. 12, matching the TAN approved earnings of $318,681.18.

241.    TAN had previously approved Ti's cost loaded schedule that Ti revised at least four times as required by TAN.

242.     However, following submission of the Prompt Payment Certificate which matched the Contractor Pay Request No. 12, TAN then again made reductions without explanation.

243.     TAN did not conduct a new physical walk through of the project.

244.     Without justification, eight (8) days after submission of the proper Prompt Payment Certificate, TAN required Ti to again adjust its previously approved by TAN cost-loaded schedule.

245.     Based on the required changes to Ti's cost-loaded schedule, TAN required Ti to modify the Prompt Payment Certificate for Estimate No. 12 (at **Exhibit K**, November 15, 2012).

246.     These latest required, unexplained and unjustified changes caused a reduction in the previously approved earnings to a value of $ $240,820.70, a reduction of $77,860.48.

247.     No explanation for that reduction or requirement is given in any of the pay documents nor is it annotated in the Remarks.

248.     ENG Form 93 for Estimate No. 12 reflects "5% retainage, $8837.04, for being behind schedule per aggressive management."

249.     ENG Form 93 for Estimate 12 does not reflect this newly retained amount at Block 14F.

250.     ENG Form 93 for Estimate No. 12 shows a "Previous Retained Percentage" of $-22,867.88 as opposed to what should be the correct amount of $246,443.59.

251.     By not properly deducting the retained percentage or amount at Block 14F of ENG Form 93 and not accounting for the previously retained amount, Ti has no

means or record by which to recover the combined $8,837.04 and $246,443.59, for a total of $255,280.63 withheld by the Government.

252.    TAN improperly paid Ti for the period October 21, 2012 thru November 15, 2012.

253.    Based on the TAN approved Contractor Pay Request No. 13 with the LNQA's approved percentages complete, Ti earned $318,681.18 of the contract value.

254.    TAN's representative, the LNQA on whom TAN relies, walked the physical project with Ti and approved the percentages complete resulting in the value noted in the preceding paragraph.

255.    With that approval by TAN of those percentages, on November 25, 2012, Ti submitted a Prompt Payment Certificate for Estimate No. 13, matching the TAN approved earnings of $284,784.48.

256.    TAN had previously approved Ti's cost loaded schedule revised numerous times as required by TAN.

257.    However, following submission of the Prompt Payment Certificate which matched the Contractor Pay Request No. 13, TAN then again made reductions without explanation.

258.    TAN did not conduct a new physical walk through of the project.

259.    ENG Form 93 for Estimate No. 13 reflects "10%, $22,867.88, retainage for being behind schedule…10%, $5,385.77, retainage for deficient work."

260.    Block 14F of ENG Form 93 for Estimate No. 13 reflects the $22,867.88 retainage.

261.     The amount though does not equate to 10% of the amount earned by Ti for that pay period.

262.     The amount does not reflect 10% of any amount earned by Ti on any other pay period.

263.     Rather, the amount appears to be an effort by TAN to recoup an amount it seemingly believed it over-refunded Ti on ENG Form 93 for Estimate No. 10.

264.     As noted herein, numerous errors were made by TAN in these calculations throughout the payment processing and do not properly reflect the actual retainage.

265.     At this point in the payment processing, TAN had actually improperly retained and improperly accounted for $255,280.63 in retainage.

266.     TAN improperly then recouped what TAN errantly appears to have determined to be an overreturn of retainage.

267.     ENG Form 93 for Estimate No. 13 at Block 14F also does not reflect the newly retained amount of $5,385.77 for alleged deficient work.

268.     ENG Form 93 for Estimate No. 13 again shows a "Previous Retained Percentage" of $-22,867.88 as opposed to what should have been the correct amount of $255,280.63.

269.     TAN also then seemingly deducted $5,385.77 for alleged deficient work directly from Ti's Earnings for the period November 16, 2012 thru November 25, 2012.

270.    However, deducting $5,385.77 from Earnings of $284,784.48 totals $279,398.71, not the $277,149.30 figure reflected at Block 14E of ENG Form 93 for Estimate No. 13.

271.    By not properly deducting the retained percentage or amount at Block 14F of ENG Form 93 and not accounting for the previously retained amount, Ti has no means or record by which to recover the combined $5,385.77 and $255,280.63, for a total of $260,666.40 withheld by the Government.

272.    By improperly retaining an additional $22,867.88 that was not an overreturn, Ti believes that figure should be added to the amount that the Government had actually retained, $260,666.40, for a total of $283,534.28.

273.    TAN improperly paid Ti for the period November 16, 2012 thru November 25, 2012.

274.    Contractor's Pay Request No. 14 with the LNQA's approved percentages again reflects this same pattern of errant processing.

275.    The one dated December 2, 2012 reflects that Ti earned $633,956.41 of the contract value.

276.    TAN's representative, the LNQA on whom TAN relies, walked the physical project with Ti and approved those percentages complete from the December 2, 2012 certification.

277.    Then the certification dated December 8 reflects $613,104.72 based on changes mandated by TAN even though no new walkthrough of the project occurred.

278. Then the certification dated December 11 reflects a total earned of $575,388.37, again based on changes mandated by TAN even though no new walkthrough of the project occurred.

279. TAN advised Ti via email that it would be paid for the work performed from November 25 thru December 2012 which TAN approved in the amount of $575,388.37.

280. However, when Ti received the ENG Form 93 for Estimate No. 14 it reflected a total of $0 in the "Earnings this Period" section, 14E.

281. That same ENG Form 93 for Estimate No. 14 reflected $0.00 in the "Previous Retained Percentage" section, 14B.

282. The amount at 14B should have reflected $283,534.28.

283. TAN improperly paid Ti for the period November 25, 2012 thru December 11, 2012.

284. TAN improperly processed the Pay Requests across the MOI project.

285. As outlined herein, Ti calculates it is owed $727,688.23 for construction activities completed at the MOI project site and approved by the LNQA.

286. The figure in the preceding paragraph does not include the $283,534.28 as noted as improperly accounted for by TAN.

287. The Government's failure to properly pay Ti on other projects Ti was performing for USACE across Afghanistan created cross contract financial impacts on Ti that made completion of the contract by Ti Commercially Impracticable, further excusing Ti's delay, if any, in performance of the MOI contract.

288.     TAN also subjected Ti to these same improper payment procedures addressed herein in Count 6 of this Claim on other Ti projects across Afghanistan on which Ti was working for TAN.

289.     On those other projects, TAN also arbitrarily and capriciously reduced the LNQA approved construction activity completion percentages.

290.     The arbitrary and capricious reduction of LNQA approved completion percentages; improper payment processing; and improper and excessive retainage across Ti's projects with TAN in Afghanistan was such that Ti regularly and repeatedly brought these financial issues to TAN's attention.

291.     Ti raised its concerns at each project location during regular project meetings and even irregular project meetings with TAN representatives.

292.     Ti raised its concerns via Serial Letters to TAN.

293.     Ti senior management discussed these issues with TAN at the TAN requested project update meetings that occurred approximately every four to six weeks in 2012.

294.     Resident office personnel, Contracting Officers, TAN Division/Directorate Chiefs, and even TAN's Commander attended some or all of those project update meetings and all were aware of Ti's concerns.

295.     TAN regularly dismissed these concerns as Ti's problem.

296.     In the Cure Notice on this project TAN then improperly used the financial hardship for which TAN has responsibility against Ti.

297.     In the Show Cause Notice on this project TAN then improperly used the financial hardship for which TAN has responsibility against Ti.

298.    In the Notice of T4D on this project TAN then improperly used the financial hardship for which TAN has responsibility against Ti.

## COUNT 7 – ABUSE OF DISCRETION BY THE CONTRACTING OFFICER

299.    Ti incorporates all preceding paragraphs as if such paragraphs were again fully set forth here.

300.    The Contracting Officer's Decision to Terminate Ti for Default based upon a finding that "T[i] cannot perform work to specifications while attempting to recover schedule," was improper, arbitrary and capricious.

301.    At pages 6-7 of C-0014, TAN states that the "quality of work that [Ti] actually did complete has been lacking, further endangering successful completion of this contract."

302.    The Contracting Officer specifically stated that Ti alleged it had been working at an accelerated pace and that during that accelerated work that Ti's construction quality had diminished (C-0014, page 6).

303.    TAN thus concluded that "T[i] cannot perform work to specifications while attempting to recover schedule" (C-0014, page 6).

304.    TAN alleges three primary deficiencies that will allegedly result in approximately three quarters of the work completed by TI in November having to be removed and re-completed in accordance with the specifications (C-0014, page 6).

305.    TAN alleges (1) Ti prematurely stripped the forms surrounding the concrete, thus not allowing proper curing time for the concrete, and resulting in deficient CMU work.

306.    There are no CMU load-bearing walls on this project.

307.    Thus, TAN must only be referring to the 200mmx200mm bond beams shown on sheet S-511 in Details 3 and 5 of the contract.

308.    According to "ACI Chapter 6 – Formwork, Embedments and Construction Joints" any non-bearing CMU bond beams require 12 hours to cure before formwork is stripped (See Structural Concrete Building Code, ACI 318M-11; Commentary, Chapter 6 – Formwork, Embedments and Construction Joints at paragraph 6.2.1 – removal of forms; and Commentary R6.2 – Removal of Forms, Shoring and Testing).

309.    Ti actually exceeded this requirement as no formwork from "Bond Beams" was removed before at least 24 hours of curing occurred.

310.    Ti also has independent laboratory concrete testing reports that certify all concrete strength and concrete physical properties of these "Bond Beams" are within the required parameters (See **Exhibit N**).

311.    TAN also alleges that (2) Ti "did not place the concrete in accordance with ACI 306R-88" (C-0014, pages 6-7).

312.    The only time during concrete placement where threat of freezing weather was experienced was three days before issuance of C-0011.

313.    The freezing temperatures occurred at 2:00 a.m., not during concrete placement.

314.    All Shear Walls placed that day were also protected according to the "Cold Weather Concrete Placement Plan" submitted and approved by TAN.

315.     When freezing weather is required during concrete placement, the water needs heating.

316.     When freezing temperatures are expected some nine (9) hours after the placement is completed, heating water is not required and counterproductive since the concrete may overheat three (3) hours after the placement.

317.     The temperature during placement was never below 45 degrees Fahrenheit.

318.     Ti did what is required to protect and keep the walls warm by covering the Shear Walls with 6" Batt insulation.

319.     Lastly, TAN also alleges that the curing of these Shear Walls was not accomplished for the requisite seven (7) days (C-0014, page 7).

320.     TAN ordered "Suspension of Work" less than 48 hours after the walls were placed.

321.     If the walls have cracks and are not properly cured, it is due directly to the timing of the Government's Stop Work Order and the lack of coordination with Ti on the construction activities associated.

322.     TAN also alleges that TI did not properly build shear walls for the first floor of the main headquarters building (C-0014, page 7).

323.     Without proper contractual or industry standard references to the alleged deficiency, replying to the allegation is difficult.

324.     If TAN was referring to the contract requirements at Section 03 31 00.00 10 (Cast in Place Concrete), paragraphs 3.1.2 and 3.1.2.1, which detail the placement

of structural concrete, there is no mention of "Bonding Material" or a "Bonding Agent" of any kind.

325.     A "Bonding Agent" is not used in concrete Shear Wall construction.

326.     Any mention of a "Bonding Agent" of any kind in the contract is used in reference to specifications dealing with Masonry, Stucco, Lath and Plaster or Concrete Repair, not in reference to any structural concrete placement.

327.     All Shear Walls built by Ti were built in accordance with sheets S-751 thru S-764 in which there is no reference to any "Bonding Material."

328.     If instead TAN is referring to "CMU Bond Beams," Ti refers TAN again to the 200mmx200mm bond beams shown on sheet S-511 in Details 3 and 5 of the contract.

329.     All non-load bearing CMU walls have no more than five (5) courses between Bond Beams, have all their cells filled and the beam over the window is 30% larger than that which is specified due to the fact that the window depicted in sheet S-511 detail 3 is drawn the wrong size and configuration in the Government supplied drawings, causing vertical distances to be adjusted.

330.     In making payments to Ti in accordance with the submitted pay requests, finalized via EN 93s without any noted deficiencies, TAN accepted the work without alleging any of the deficiencies noted in C-0014.

331.     Ti's Surety, Zurich, sent independent investigators to the project site.

332.     These independent investigators inspected the site on two occasions in January 2013.

333.     Zurich's independent investigators did not find any of the alleged Quality deficiencies TAN noted in C-0014.

334.     TAN's decision not to accept the corrective action plan developed jointly by Ti, its project partner (Yenigun), and the bonding company (Zurich) to allow Ti to continue with its recovery schedule with the support of its project partner funding all long-lead items at issue was without reasonable explanation, making it arbitrary and capricious.

335.     The decision not to accept the alternative corrective action plan to allow Ti's project partner (Yenigun) to take over as the prime contractor with Ti in a supporting role to complete the project in accordance with the recovery schedule submitted was without reasonable explanation, making it arbitrary and capricious.

336.     On information and belief, TAN sent a notice to Ti's bonding company (Zurich) that Ti was at imminent risk of termination.

337.     On information and belief, in that notice TAN gave Zurich a deadline by which to present a plan to TAN for completion of the MOI project.

338.     Working with Ti, Zurich submitted 2 options to TAN within the timeframe allotted.

339.     The first option was to allow Ti to continue as the prime contractor with Yenigun supplying all the capital necessary to order the long lead items about which the Government complained and for the partners to complete the project in accordance with the recovery schedules submitted.

340. On information and belief, Zurich provided the Government all the necessary documentation and assurances of the signed contracts for said long lead items and evidence of Yenigun's financial capacity to place said orders.

341. On information and belief, the second option was to allow Yenigun to assume the role as the prime contractor and allow Ti to work under the oversight and direction of Yenigun to complete the project in accordance with the recovery schedules submitted.

342. TAN's rejection of both corrective action plans developed by Ti with Zurich and Yenigun was without reasonable explanation, arbitrary and capricious.

343. C-0014 also alleges that Ti failed to provide the Government notice of any of the bases for which Ti was entitled to a time extension.

344. This conclusion by the Contracting Officer is contrary to the facts, evidencing an abuse of discretion and an arbitrary and capricious decision resulting in improper termination of Ti for default.

345. The shared ECP usage was precipitated by Government request.

346. The Parties discussed the possible delays in advance of Ti agreeing to share the ECP.

347. Ti regularly raised concerns to the Government regarding the delays caused by the joint ECP usage.

348. Providing additional written notice of the impacts was unnecessary and redundant.

349. Nonetheless Ti continued to inform TAN via verbal discussions, in weekly meetings, and at special project meetings called by the Resident Office of the

impacts the shared ECP had on its operations due to changes in security at the ECP upon which Lakeshore insisted

350.　　These delays had impacts that Ti would not otherwise have encountered.

351.　　The delays were unanticipated by Ti in preparing its proposal or the initial schedule for the project.

352.　　These delays cannot be attributable to Ti.

353.　　Ti also informed TAN of the delays and possible or actual impacts with each schedule provided, either with a Pay Request or in response to Government request.

354.　　Ti also informed TAN of all delays and possible or actual impacts via weekly project meetings, which were also captured in writing in the meeting minutes provided herein.

355.　　TAN was also informed of the delays and possible or actual impacts in special project meetings called by TAN's resident office.

356.　　TAN was also informed of the delays and possible or actual impacts in project update meetings called by TAN headquarters personnel at which the Contracting Officer(s) was or were present.

357.　　TAN regularly turned over Contracting Officers.

358.　　TAN regularly turned over Contracting Officer's Representatives.

359.　　TAN regularly turned over Administrative Contracting Officers.

360.　　Failure, if any, of the outgoing personnel to inform replacement personnel of the issues raised by Ti should not be attributable to Ti.

361.     TAN alleges that time was of the essence and material to the decision to terminate Ti for Default.

362.     On information and belief, TAN did not procure a replacement contractor for the work at issue until July or August 2013.

363.     Ti's last schedule, included in the plan presented by Ti's bonding company, showed Ti reaching substantial completion by August 2013.

364.     Any contractor selected by TAN did not even begin work by that date.

365.     The contract at issue also contains a Liquidated Damages ("LDs") Clause.

366.     LDs serve as a contractually provided remedy for the alleged delay, if any.

367.     TAN expected a dispute over the time issues as noted in all correspondence from Ti.

368.     TAN then further alleged in C-0014 quality concerns not previously raised in any correspondence with Ti to bolster the termination decision.

369.     All of these factors led the contracting officer to decide to terminate Ti for default based upon incorrect, incomplete or inaccurate information.

370.     A decision to terminate a contractor for default based upon this unreliable and unproven information is arbitrary and capricious.

371.     A contracting officer's decision to terminate a contractor for default that is arbitrary and capricious in its basis evidences an abuse of the discretion imparted to a contracting officer.


**COUNT 8 – CLAIM FOR GOVERNMENT DIRECTED ADDITIONAL COSTS**

372.    Ti incurred additional security costs at the direction of the Government following the Suspension of Work Notice.

373.    The additional security costs total $3,829.30.  (See **Exhibit L**).

374.    Based upon TAN's termination of the contract at the direction of the Contracting Officer, TAN ordered Ti to demobilize from the construction site.

375.    Ti incurred demobilization costs to vacate the site.

376.    Ti incurred expenses in the amount of $202,520.53 to demobilize (See **Exhibit L**).

377.    These directions by the Government, respectively, amounted to changes to the contract pursuant to the Changes Clause.  FAR 52.243-1.

378.    The Government never paid Ti for these costs.


## VI.  DEMAND FOR RELIEF

Wherefore, Plaintiff (Ti) demands the following relief:

1. A declaration that the decision to terminate for default Plaintiff's rights entirely under contract number W912DQ-12-C-4000 was improper, for one or all of the reasons set forth above;

2. Conversion of that Termination for Default to a Termination for Convenience;

3. Payment as just compensation from the United States in the amount of $727,688.23 for the costs of construction services performed under the terms of that contract up to and including the date of termination; return of retainage on Ti's earnings across the project demonstrated above as not properly documented by USACE in the amount of $283,534.28; $1,113,917.23 for the supplies and materials